1516 Milwaukee Electric Tool Corporation v. Snap-on Incorporated. Mr. Trello. Thank you, Your Honor, and may it please the Court. The judgment in this case rests first and foremost on a claim construction error. The 20-amp limitation that appears in all of the asserted claims was, by everyone's account, the key to this case. The District Court's constant current construction of that limitation formed the basis for the summary judgment rulings that rejected Snap-on's anticipation, derivation, and inequitable conduct defenses. Defenses that rested on prior are never... The claim construction proposal you had below is different than the one that this Court issued in that IPR appeal a proposed, but in other ways it wasn't. To the extent that's inconsistent with what this Court proposed in the IPR appeal, are you giving up on those arguments for those portions of your proposed construction? Well, we... If what... If your question, Judge Chen, is... Let me take a step back. There were two... There are two separate issues presented by the 20-amp limitation, as I think this Court in the There's a question of, does average mean average, or does it mean constant? And over what duration are you measuring either average or constant? Right, and this Court resolved both of those questions, one in a way that you would like apparently, and one in a way that you don't necessarily like. Well, one in a way that we're not contesting any longer. Right. And was that your question? Yes, I'm sorry. Yes. That's what I was... So you're asking for the same construction that this Court used in the IPR? Exactly. Exactly. And you're not... There's no debate over whether broadest reasonable construction and Phillips are any different in this context? Well, certainly not on our part. We think that there is... The analysis that this Court did in the IPR appeals was really a Phillips analysis claim language. Can you read out the word average? The specification indicated that You certainly did, but I would suggest that you invoked it in a way that suggested that the result would be the same, because you said the term average should be given its plain and ordinary meaning, especially in light of the BRI standard. And even putting that aside, you know, let's pretend that the Court didn't even consider the issue in that case. There's no basis in the any different construction here. Everything that pointed to that construction in the prior appeal points to the same construction here. Intrinsic evidence... Assuming we use that construction then? Yes. So the construction from the prior appeal. How does that really affect the decision-making? It affects it in a number of ways. First of all, on the summary judgment rulings, the District Court... I mean, we know that it affected it because the District Court told us that. Appendix page 81, he's talking about the inequitable conduct. He says the main problem, most glaring flaw, I think is the word he used in Snap-on's argument, was that it rested on Snap-on's preferred construction of average rather than Milwaukee's. There were numerous times where he said the resolution of the construction to be a constant current takes him a long way towards resolving the issue. Exactly. And so that's it. That's a summary judgment. And then as for the jury trial on obviousness, the jury was instructed on the constant current construction. It was told it had to apply the Court's construction. Milwaukee continually stressed the difference between average and constant as the distinguishing feature that distinguished the Mollie prior art. The constant current limitation was supposedly the key to the secondary considerations. So it really, it drove the entire proceeding. So I think it made an enormous difference. And let me maybe just focus for a moment on the summary judgment rulings because I think it's clear that as to the Mollie prototype packs, and these are the ones that Mollie supplied... Is that the 15-amp? Yeah, the ones with the 15-amp cells. There is evidence in the summary judgment record that those packs satisfied a 20-amp average current over the entire capacity construction. That last part, over the entire capacity, where is that in the record? That is 15-amp initial Mollie prototypes. Appendix 7327. That's our experts' declaration submitted at the summary judgment stage. And he didn't just make that up. He said looking at Milwaukee's and Mollie's tests, that shows that it would produce 20 amps on average over its entire rated capacity. But didn't the examiner allow these claims over prior art that satisfied the 20-amp limitation? No, I don't think that's true. And certainly not over the Mollie prior art. The examiner allowed the claims over prior art that supposedly... And I mean, we've got a separate question about how fulsome the disclosure of that art was. But the issue there was just it was represented to him that, you know, these cells crashed and they weren't any good. So I don't think you can use that as an indication that the Mollie prototype packs, certainly on this record, the evidence is that they And so just on that basis alone, summary judgment on derivation and anticipation was inappropriate because there was at least a factual issue as to that element of the claims. And on that point, I mean, you actually ask us to straight out reverse on those points. But how could we possibly do that? I mean, if there was a summary judgment analysis and you think it was done on the wrong claim construction, aren't there material issues of fact that would have to be fleshed out? They're both factual questions. Well, they are factual questions. And certainly at a minimum, we think the summary judgments need to be vacated and remanded. We don't really think there's any contrary evidence as to the Mollie prototype packs satisfying an average 20-amp over the entire rated capacity. But, you know, certainly, Your Honor, to the extent that there is, that would be a factual issue that would need to be thrashed out. But I don't think there's contrary evidence in the summary judgment record on that. I'd also like to turn briefly, with the Court's permission, to the question of enablement. The District Court entered summary judgment striking our enablement defense. According to Milwaukee, and it was in the nature of this invention, is that it provided lithium-ion battery packs that could deliver a minimum performance standard of 20-amp current. There's not a word in these patents about how you do that. The patents are just a listing of conventional battery chemistries, known cell types, known sizes, with the possible exception of one size, and record indicates that Mollie proposed that size, without any indication at all of how you bring these together to make the supposedly revolutionary advance of producing 20 amps of, whether average or constant current, it doesn't doesn't shed any light on either one of those. The specification has only one reference to 20 amps, and it was one that the Court focused on in the claim construction and the IPR appeals. And that just says that in one construction, the battery pack of this, you know, can produce, can power tools and produce 20 amps on average. Well that's a result. It doesn't tell you how to get that result. So the pack configuration, I mean everybody proceeded on the assumption that the pack configuration was a critical part of the invention, right? Because obviously that was part of the The pack configuration, if you look at the claims, the claims basically have two components. It's a housing that can support the weight of the battery cells, and lithium-ion battery cells capable of producing 20 amps on average. The way the District Court construed the housing limitation, and this is an appendix pages 39 to 41, it's completely conventional. All it is is a housing that can support the weight of the cells. It was stipulated, and this is at 29, 9, 11, and 12, stipulated below that the prior out our nickel cadmium housings did precisely that. So it is, I would... But isn't it in the preamble that we're talking about battery packs? Oh certainly, certainly. The invention is a battery pack, but it is a battery pack comprising the housing and the cells, and the housing is completely conventional. But wasn't there testimony that it was Milwaukee that was really playing the role of the pack design, and that there were problems with overheating or something like that? And so therefore, because of those problems to make this product operational, that's where Milwaukee was deeply involved in trying to help make the thing actually operable and reduced to practice. Well, let me say a couple of things about that. First of all, Milwaukee told the design of the prototype packs. So to the extent we're talking about... The original prototype packs. Correct, correct. But we're talking about the ultimate product that they felt was reduced to practice. Sure. The later ones, whether it was 20 amp, 30 amp, 40 amp. Sure, and there is, there is actually, I mean there are assertions that Milwaukee had some role in that, but what the record actually shows is that what Molly was doing was putting these 25 amp, 30 amp cells into conventional packs, prior art packs. There was, there was no, there's certainly nothing in the record showing any unique pack design, and there's nothing claimed in the... The claims don't call for that. So even if... You don't think it was meaningful that Molly agreed that Matt was also an inventor? I mean, if Molly was really the only one who invented this, why wouldn't there have been a debate over that? Well, I think it's important to put this in context, Your Honor. At the time that Molly made the assignment, which is a couple of years after the actual, the claimed reduction to practice, the patent applications that were pending at that time were not nearly this broad. They were two of 28 volt battery pack, which is, which Molly had nothing to do with. 28 volt was in fact something new at the time. So the fact that Molly was willing to give up its rights to claims that it thought were going to be 28 volt claims doesn't shed any light on what they may have thought had they seen these claims. These claims that basically say, hey, you know, any battery pack, any housing with lithium ion cells that can get you to 20 amps, we invented it. Well, Is there any evidence in the record that what was being submitted by Molly wasn't just the cells, but it was the actual packs with the cells in them? Yes, there is. I think, and I would even... There seems to be some dispute, and I can't figure out, was Molly just sending in new cells, or was it sending ready-made in a pack? They were sending, well, they were doing both. They were sending in ready-made in a pack, but I think you can actually, in the summary judgment opinion, for example, the court notes that in April of 2002, Molly supplied more than 20 packs with its 30 amp cells. So there's no question that Molly was sending Milwaukee packs with cells in them. Now, I think, where I think the district court went astray, and I would submit another legal error the court made, was the court's notion that because Milwaukee had told Molly, hey, we need more powerful packs, that then when Molly came up with a way to do it, that somehow that meant the conception was with Milwaukee rather than Molly, when clearly just asking for a product that can do something, it's not the same as conceiving how to actually produce that product. And I wouldn't disagree with that proposition, but there's a lot of facts that seem to show a lot more interaction and working together than just asking for something that could do something. Well, there certainly are assertions about that, but I think if you look, again, I'll refer the court to the district court's own summary judgment order. For example, appendix page 19, the court says, Molly, and this is talking about the 25 amp cell, Molly had changed the chemistry for the 25 amp cell from the 15 amp. The improvements were Molly's idea. A little further down, Molly made further changes, including electrolyte changes, which enabled it to create a 30 amp cell capable of producing better performance. And on the next page, Reimers, that's Molly's scientist, suggested adjusting the cell chemistry and electrode size, etc. So there were certainly a lot of improvements, and they were improvements in response to Milwaukee's request for a better battery, but they were Molly's ideas. It was not Milwaukee that was making the improvements. Let's hear from the other side, and we'll save you some rebuttal time. Mr. White. Yes, good morning, Your Honor, and may it please the court. I'd like to begin by addressing three arguments that I heard from the opposing side just now. The first was that the examiner did not allow the claims at issue here over the Molly Prior Art prototype packs. That is simply not true. The prototype packs were tested. The test data was submitted to the Patent Office, along with a declaration from Gary Meyer, one of Milwaukee's inventors, explaining what those packs were, how they worked. The declaration from Mr. Meyer is at Appendix Site 5629. All that information was thoroughly considered and evaluated by the examiner before allowing these claims. Right, and then the applicant said, those prototype packs don't work. They're not operable. They did not come close to delivering their entire rated capacity. But now we're in a new question, which is, given what arguably is the accurate conception of what the claim actually calls for, which is an average discharge current of 20 amps over the entire capacity, and not a constant discharge current of 20 amps, maybe that Meyer declaration wasn't entirely accurate when it said that these initial Molly prototypes weren't operable. And that it is still accurate, even under that construction. How do we know that? We know that because one of the tests that was run on that prototype pack that was submitted to the Patent Office was what they called a cutting test that had current go up and down, above 20 amps at some times and below 20 amps at some times. That is the very first test result in the Appendix 5629. And that is what they point to, the only thing they pointed to, when you ask them what shows that under the new construction of an average shows that a And they pointed you to one thing, their expert report 7327 in the Appendix. If you look at that site, it's one paragraph in their expert report, that expert is relying upon the test, the first test, the cutting test that was submitted to the Patent Office. But if you look at it, what does it show? It does show an average of 26.19 amps, but it doesn't even get half the capacity, not even half. If you look at the kilojoules, it's five, kiloamps. If you look later in those test results, you see a 1C test, which is used to determine the entire capacity, that shows the entire capacity of that pack is 10 kiloamps. So when you look at the volume, it's a calculation of volume. It's not even half. So even if you take an average, if you look at a current that fluctuates up and down, and you look at the only thing that they point to is saying, aha, here's the current that can do it, it doesn't come close. So Mr. Meyer's characterization of that pack not being operable to deliver the entire rate of capacity does not change even under the different construction with the word average inserted into it. I don't, I think I follow everything you just said, but I don't think that's something that we as an appellate court can make a ruling on. Well, I think you can. I don't, let me, I'll come back to that in a minute. Let me address these other couple points. The other thing that we heard was that the claim construction was determinative for the summary judgment rulings. I would point your honors to two different appendix sites. The first is the summary judgment ruling itself at page 44, where the court quotes and says, it talks about Snap-on's arguments at summary judgment on anticipation and derivation. And it says, this is so, Snap-on says, even if one finds that plaintiffs have the proper construction of the 20 implementation. Page 44 of the summary judgment ruling? Correct, yeah, the appendix site 44, which is the summary judgment ruling. Appendix 44. Okay, so where are you? I am the second paragraph up from the bottom. Okay. Where it says, Snap-on claims that plaintiffs derived the present invention from Motley, which is conceived of it and communicated it to plaintiffs. This is so, says Snap-on, even if one finds that plaintiffs have the proper construction of the 20 implementation. So that's Snap-on's position. That's not the district court's position. No, it is, though. And if you look to their brief itself, which is also in the appendix, it's page 2001, they said that their anticipation arguments applied regardless of claim construction. That's the heading, regardless of claim construction. We're talking about Snap-on's position. Correct. That's true. But the district court's ruling seemed to be dependent on it believing that the 20 limitation required constant current. Yeah, I think that's true. So it, I mean, I don't think it was dependent on one ruling. So, I mean, that's why I question whether the district court's ruling can be affirmed based on the district court having an alternative ruling that even under an average current understanding of the claim that there's no derivation, there's no anticipation, there's no 103, there's no enablement problem. Sure. And it still can as well. So let me back up because one thing that I think that we've seen is that the appellant has misstated the scope of the district court's summary judgment rulings. The court's ruling was narrow and limited and it did not prevent appellant from making arguments about battery packs. And let me explain why. It's a little bit complicated, but I'll walk you through it. The summary judgment ruling that we sought and obtained was limited and narrow because we sought judgment that appellant could not prove derivation based only on individual prior art cells. And the reason we did that because the claims all seem almost silly, but at the time before we went into trial, appellant was arguing that the claims were anticipated based upon individual cells alone. We said that can't be true. The claims all require a battery pack. So the derivation ruling that we sought on summary judgment was based only on individual cells. So are you disputing that the 30 amp prototype that they eventually gave Milwaukee weren't packs of 30 amp cells? I'm not disputing that they weren't packs of 30 amp cells, but those were not done by Molly alone. Those were not prior art. There was substantial evidence introduced at trial that those packs did not constitute prior art. Why is that? Because Milwaukee was involved in developing them. And how was Milwaukee involved in them? I understand that Milwaukee had certain performance requirements, which were actually industry standard requirements. And they asked Molly to hit those performance requirements. It would be like if I asked you to make me a car that has gas mileage of 150 miles per gallon, and then you went ahead and figured it out and did it. That's just a performance requirement. If that's all that happened, then it may be an issue, but that is not at all what the record reflects. So once Molly and Milwaukee started working together, they formed what they called the 884 Project Team. And there's numerous examples of the meeting minutes from those project meetings in the record. The meetings happened twice a week involving engineers from both companies. And in fact, the engineer leading up the battery chemistry team was Gary Meyer from Milwaukee Electric Tool. And they had meetings talking about what they needed to do, how they needed to achieve the results. And Gary Meyer's testimony, which is uncontroverted right now at trial, and this is in Appendix Sites 15-618-620 and 15-638-640, he explained in detail the contributions that Milwaukee had. But isn't there also testimony where someone from Milwaukee acknowledged that the actual battery chemistry was basically a trade secret of Molly's and Milwaukee didn't actually know all the details of the battery chemistry for these lithium ion battery cells? So I think that goes beyond. I know what you're referring to. It was an email from one Milwaukee engineer. Now, we have to step back and put this in context. But so that's the point. What we're doing is we're debating facts here, right? So how is this a summary judgment case? I mean, it seems to me that derivation is such a fact-based inquiry and there are so many debates over who did what and who knew what. Why isn't this a case where the derivation issue should have gone to the jury? Because I think that there's really two things. Derivation, the only argument that was taken out on summary judgment was individual cells. And an individual cell is not a pack. So the argument that the individual cells could not be an anticipatory reference for a battery pack claim, I think, was entirely proper. It was limited to those specific issues. It did not prevent them from making other arguments about any prior art packs that they could prove up as prior art. If you look at the court's summary judgment ruling, this is Appendix 88, the actual conclusion says, as a result, Snap-on's anticipation and derivation defenses based on the Molly's cells will be dismissed. The ruling says nothing about them not being able to argue about battery packs or making other arguments. It was limited to that alone. They cite the two portions of the record, Appendix 155, 96, Note 3. Look at those. I think that's based on a ruling, a finding by the judge that that's all that Molly gave to Milwaukee. Because there's statements in there where the judge seems to be making a finding that all that Milwaukee was getting was just individual cells. And that was a finding that I kind of questioned whether it was appropriate to make on summary judgment. And I don't believe that's true. He considered both sides' presentations of the evidence. But at the summary judgment stage, I think he says quite clearly it was uncontroverted as to contributed what and who gave what. Based on the summary judgment record that he had before him, he was fully within his power to say that the derivation here based on individual cells has to fail. How do we get around this sentence? Much of Snap-on's position rests upon its own preferred construction of the 20-app limitation. And that construction having been rejected, little additional effort need be expended to that construction, that the court's construction was inaccurate. Why shouldn't we say, yeah, we think that more effort needs to be expended? Because I think if you look at the timing of where that comes in the order, it comes at the very end after he's already addressed the other issues in detail. So he's gone through the derivation defense in detail and gone through the anticipation defense in detail. I don't want to say it's a throwaway statement, but it comes up at the end. And there's really nothing to address after that. And it doesn't really address anything after that. All the heavy lifting that goes into analyzing the issues of derivation and anticipation occurs before that. Well, let's talk about enablement for a minute before you run out of time because, you know, it's kind of difficult for me to put together the notion that the trial court said that there was sufficient enablement as a matter of law. And then the jury said that it wouldn't have been obvious to do this. So if you need to disclose it in the specification, which the trial court said, well, you didn't need to because everybody would have known how to do it. Then how is it non-obvious? Sure. And I'm happy to address that. So first, I think we need to start from the premise that the enablement requirement and analyzing enablement, you start with the claims and you have those to work with, and you need to work backwards from there to see, are these claims supported by what's in the specification? Right. So you have the claims basically as a roadmap to try to find the things that you need to enable it. Right. And do you believe that the preamble referencing PACS is limiting? Or, I mean, the claim really just does talk about housing as your friend on the other side said. It does. It does. Absolutely. It requires a battery pack. And if you look through the specification, and this is explained by our expert, Dr. Blomgren, in his declaration at Appendix Site 5702, it goes on, he identifies the underlying building blocks that are necessary to enable this invention. And he ticks them off and talks about the cell chemistry is disclosed. The cell geometry and size are disclosed. But again, that we're just talking about the cells then. Well, it goes... The part that you said isn't enough. Well, I'm not there yet. So he talks about four things. Cell chemistry. That's one of the things you need to know the chemistry to make it enabling. The geometry and size. The size and shape of these cells was important. Battery pack management. As you noted, heat management and things like that were important. And then battery pack design. Those are the four things that he identified as being critical to enablement and explains why each of them was disclosed in the specification. Now, remember, it's summary judgment states... Why isn't the... What is in the content of the specification really nothing more than what was already known in the prior art? And so therefore, there's a gap in terms of actually disclosing the beef of the inventive concept of actually making these lithium-ion batteries work in a pack. But it is not. So there was nothing in the prior art that had a 20-amp capable lithium-ion battery pack for a power tool. So where in the specification does it explain how you get to the 20-amp capability? It's the combination of all those things. So as Dr. Blomgren explained, you need to consider a couple things. What got them there was having a certain cell chemistry, a certain cell size and geometry, along with the battery pack design. It was that combination of things. When you put them together, that's what gets you the 20 amps. And that would have never been done before. And I just want to note that it's summary judgment... I don't understand. You put all those things together, it would get you to a variety of amp levels. But how do you get to the average 20-amp? Where does it say that putting those together would do that particular thing? It says that in the specification where it explains that in the, for example, the cutting test using this type of dimension with the saw, you can get to the 20-amp limitation. Where? Where? What's the dimension of the saw? I mean... No, no, not the dimension of the saw. Where in the spec is that? Sure. So, in column 10, line 20, it says in some constructions the battery pack 30 can power various power tools. Including a drill driver, 300, and a circular saw, 305. Having high discharge current rates. For example, the battery pack 30 can supply an average discharge current that is equal to or greater than approximately 20 amps. You can have an amp hour capacity of approximately 3.0 amp hours. And that is building upon everything that came before it, including the pack design, the cell chemistry, the cell geometry, and the cell size and shape. And again, Dr. Blomgren goes through this, and I do want to mention, that was uncontroverted. So, at summary judgment, we had an expert declaration saying, this is enabled and here is why. An appellant did not have any countervailing expert testimony. It had none. It had attorney argument only. So, to advance an enablement theory, especially on something like this, I don't think they can sustain that without having an expert testimony to back them up. Whereas ours was uncontroverted at that point. Can you go through exactly what it was? I mean, when I looked at the claim, it's very basic, right? It's very broad. There doesn't give, doesn't really provide any details. It's just a housing. And it's just a set of batteries, lithium ion chemistry batteries, that get you a certain performance level. 20, average current of 20 amps. Okay. So, which of those features did MET invent so that it can be regarded as a co-inventor? And I would say it invented the entire combination of that. So, if you go back to the prior art, and this came up during the IPR appeal, and looked for any battery pack that could deliver high current using a lithium ion battery chemistry, you cannot find it in the prior art. Let's just assume for the moment that it was MAHLI that put in the work and used its insights to figure out how to create lithium ion batteries that accomplished the 20 amp limitation. What's left to do except slam them into a housing and there you go, you've got your battery pack. So, MAHLI did not do that. In fact, the prototype pack that they came to Milwaukee with originally, had 15 amp cells in it, I think, as you recognized. And everybody acknowledges, even Dr. Horne, an appellant expert, acknowledges that that pack could not meet the 20 amp requirement. In fact, when Milwaukee met with MAHLI... But then they came forward with other batteries. But that was only after Milwaukee started working with them. They did not... I'm just saying for purposes of this questioning, assume it was all MAHLI, where Milwaukee was doing nothing more than saying, oh, this isn't good enough. Can you do better? Oh, that one's also not good enough. Can you figure out somehow, you know, use your brilliant minds to figure out a higher powered battery? And then they came forward and cracked the code and figured out what's left of the invention, other than putting it into a conventional housing. I have to think about that. That's just simply not what happened here and not the record. Okay. Then what was it that Milwaukee did in terms of instructing MAHLI or contributing to accomplishing building battery cells that get you an average current of 20 amps? So the first thing they did was even recognizing the issue and the goal to be achieved here. Let's put that to the side and assume that's not good enough. Well, let me just say the record shows that when Milwaukee first met with MAHLI, MAHLI thought that the 15 amp cells would be good enough to power any power tool. So they didn't even have an appreciation of what was necessary. They had no background with power tools or battery packs. So that's point one. Point two is after they initially started working together, they made refinements over years, building up to a 25 amp cell, a 30 amp cell, and then a 40 amp cell. You say they made refinements. Who's they? Milwaukee and MAHLI working together. Okay. So what did Milwaukee do? So again, that is where they suggested changes to the cell size. They suggested combinations of electrolyte. This is from Gary Meyer's testimony that I mentioned before, where he went through it at trial. He gave them all kinds of testing feedback. They made suggestions to changes to the cell design, and they designed the pack themselves. And it's just not as simple as throwing these into a pack. As you noted before... Cell design. Are you saying that they had them alter the chemistry? Absolutely. The chemistry changed multiple times. It changed multiple times, but because of whom? Because of MAHLI or because Milwaukee parachuted in and say, no, change this chemical to that chemical. Well, I don't... Parachuted in, I don't think is right. They developed a joint team that worked together on that every two weeks and had constant feedbacks and revisions. So Milwaukee absolutely contributed to it. I say, just go back and look at the Gary Meyer testimony alone on that point that I gave you the sites for. He explains the changes that they made. And then with respect to the battery pack design, even the MAHLI engineer said Milwaukee was responsible for this battery pack. You got to remember back in this timeframe, the 2000 to 2002 timeframe, lithium ion was very volatile. It still is today. We all see the warnings when you get on the plane that you can't pack lithium in your packed bags because there's problems with it. It's potentially volatile. It was much more so back at this time. So pack design, you couldn't just simply take cells and slam them into a pack. Your position would be so much stronger if you were saying to us, a reasonable juror could have looked at this testimony and concluded that, in fact, this was joint inventorship. What you're asking us to say is that it was correct for the trial court to take the question away from the jury. Nobody's ever raised an inventorship issue. I mean, even Snap-on hasn't suggested that. That's the whole point of the derivation argument, though. The whole point of the derivation argument is that Milwaukee didn't invent this. It was all MAHLI. There is testimony in the record from MAHLI that they are not inventors. Of this invention. So they entered into a beneficial contractual agreement with Milwaukee. And then maybe they said what they said in terms of that contract. But what we have to look at right now are the facts and trying to understand what is the story and who did what in creating this claimed invention. And what I'm really trying to understand is, what is it that's in this claim that came from Milwaukee? And it's hard for me to tell right now. It's that entire combination. And Snap-on told the story to the jury. So I know your question was, it'd be one thing if we were saying a jury made a call on this. They absolutely did. Snap-on presented this defense throughout trial. Their argument was MAHLI created this. They had MAHLI witnesses come in and testify on their behalf. Did the court give them a charge on derivation? Not on derivation, no. They took order. Derivation was out. But again, that was because of the individual cells that that was the only thing that was granted summary judgment on. They didn't ask for a charge on derivation. So if they did not put in a derivation defense based on PACS or something else that was not foreclosed by the summary judgment ruling, that was their choice. There was never a suggestion that they could put in a derivation defense that we objected to and was taken out. And in fact, the 102F instruction was in there in terms of prior art that could be used for a 103 combination. Okay, to move on. So thank you. I appreciate your time. I did want to say that I do believe the original construction is supported by Phillips here. We did have a broadest reasonable construction in the IPR appeal. But we do think that there's intrinsic record evidence, including the examiner's statements and comments on the Gary Meyer Declaration that support the original construction under Phillips. But even if it changes, it doesn't matter for the reasons that we've talked about. Thank you, Your Honors. Thank you, Mr. White. Mr. Trello. Thank you, Your Honor. Can you address that point about whether or not you could have asked for a jury instruction on derivation and chose not to? No, we could not have. The judge granted summary judgment on our derivation defense. And this notion that it was based only on cells is just wrong. We argued about, for example, and the judge talked about in his summary judgment order, the 30-amp packs, which the judge said, well, I'm not going to consider those. This is an Appendix 47. Because that came after Milwaukee's request to Molly to produce more powerful packs. So that gets into this whole issue of who contributed what. And as Your Honor pointed out, I think at a minimum is a factual issue. The Meyer testimony, for example, that counsel referred to, first of all, it's very general. You say, oh, I talked about, I suggested some electrolytes and things. But more importantly for this purpose, they didn't put in any of that evidence at summary judgment. And the evidence that they did put in, even at trial, was controverted. Just for example, one Milwaukee co-inventor said the cell chemistry was proprietary to Molly. Another one said it was unique chemistry. Other witnesses testified that Milwaukee had zero input into cell design. And as I pointed out when I was up before, the district court itself in its order identified all the improvements that Molly made to the cells, including the 30 amp cells that came into the pack. So this notion that somehow the derivation defense was based only on cells and that we gave up on packs, that's just wrong. The judge said the Molly packs after the initial prototype pack were not prior art. And he ruled on that several times. And in the jury instruction that listed what was admitted prior art and what was contested prior art, the Molly cells were included. The subsequent Molly packs were included. They weren't even on the list of things that could be considered as prior art. So we certainly didn't give up this defense. This defense was taken away from us. Now on the question of enablement, counsel referred to the cell chemistry being important. But there's nothing in the patent about cell chemistry. What the patent talks about, it just says, actually, let me take a step back. The one specific passage counsel pointed to is that passage at column 10 that talks about in some constructions it can produce 20 amps. Well, first of all, that's talking about a result. It's not talking about how you get the result. But even that passage, it's not even talking about lithium ion cells. If you parse the specification, it says the battery pack 30 in some constructions can do this, produce this result. If you go back to column 5, where battery pack 30 is introduced, it says battery pack 30 can consist of battery cells 46. You read down a little bit in column 5, and it says battery cells 46 can be any rechargeable chemistry, nickel cadmium, nickel metal hydride,  So even if that were somehow suggested a clue about how you get 20 amps out of something, it has nothing to do specifically with lithium ion. It encompasses the prior art. Exactly. It encompasses the prior art. And saying that somehow it's some combination of all this that produces it. Well, sure, it is some combination of all of this prior art stuff that produced this invention. And even putting the obviousness problem with that to one side, this patent doesn't give a clue about what you take from column A and what you take from column B to put together to make this invention. There's not a hint of enablement in here. And I also just want to say that... Sounds like you're hurting your 103 argument. No, I'm not. And here's why, Your Honor. This is sort of an interesting kind of 103 case because the prior art we're relying on is the Moly 102F prior art, which was not known to persons of ordinary skill. It was known to Milwaukee because of the disclosures that Moly made. And under the Azzon Products case, that kind of prior art is prior art for obviousness purposes, even though as against the inventor to whom the disclosure was made, even though it may not be as to the world at large. So if two parties come together in some kind of joint venture or contractual arrangement to build something together, the work done by one of those two parties can serve as prior art against the second one? It can under the circumstances here. If they have a formal agreement and they disclose it to the Patent Office, this is 103C. Does your case turn on whether that's prior art or not at this stage? I'm sorry, Your Honor. Does your appeal turn on whether or not that information that between the two partners is prior art? It is relevant to the appeal. We don't need that to prevail. Certainly, I think the claim construction is enough on that. But to finish up on your question, Judge Shen, under 103C, first of all, the agreement has to be in place, the assignment or joint development agreement has to be in place before the conception and reduction to practice. We don't have that here. And it has to have been disclosed to the Patent Office in the application in order to take this out of the realm of prior art that can be used for obviousness purposes. We don't have that either. Is it your view that, say, the 30-amp battery cells or the 40-amp battery cells that were used to create a PAC, that MOLLE is the sole conceiver or it was only MOLLE that had conception and Milwaukee did not have conception even though it was Milwaukee who said, I want a battery PAC with a housing and a lithium-ion cells that meet a 20-amp power requirement? That is our view because all Milwaukee... What I just described is the claim in a way. And MOLLE wasn't going to go off on its own and do that unless it was stimulated by Milwaukee who put out that request. Well, sure, sure. A supplier that comes up may not have its own idea to come up with a new product until a customer comes and says, hey, you know, it would be really nifty if, I think Your Honor had the example, if you had a car that could get 100 miles to the gallon, that doesn't make the customer the conceiver or inventor. It's the supplier that comes up with how to do it. And that's the situation we have here. Just one final point very quickly because I've used up my time, I see. Counsel said that we didn't provide any countervailing expert testimony on enablement at summary judgment. That's just wrong. Appendix pages 72, 15 to 16 are the excerpt from our experts' report on that issue. Thank you, Your Honor. Any more questions for Mr. Trout? I do, but we've got to keep going. I'm happy to stay, Your Honor. Okay, thank you. Thank you both. The case is taken under submission.